UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Gander Mountain Company,

                       Plaintiff,         Civ. No. 04-3125 (RHK/AJB)
**MEMORANDUM OPINION
AND ORDER**

v.

Cabela's Incorporated,

                       Defendant.

---

John Edward Connelly and James W. Poradek, Faegre & Benson LLP, Minneapolis, MN, for Plaintiff.

Michael C. Cox, Koley Jessen, P.C., Omaha, NE, and George W. Soule, Bowman and Brooke, LLP, Minneapolis, MN, for Defendant.

---

## Introduction

Plaintiff Gander Mountain Company ("Gander Mountain") brought this action against Cabela's Incorporated ("Cabela's") seeking to invalidate a provision of a contract entered into by the parties in 1996. Gander Mountain claims the provision is an invalid covenant not to compete under Wisconsin law. Cabela's argues that the provision is not a covenant not to compete—rather, it regulates Gander Mountain's use of its trademarks under certain circumstances. Now before the Court are the parties' cross motions for summary judgment. For the reasons that follow, the Court will deny Gander Mountain's Motion, and will Grant Cabela's Motion.

1

**Background**

Gander Mountain, a Minnesota corporation, and Cabela's, a Delaware corporation with its principal place of business in Nebraska, are in the business of selling hunting, fishing and camping equipment and other outdoor sporting and recreational goods, apparel and services. (Compl. ¶¶ 5-8.) Gander Mountain currently sells its products in more than eighty retail stores nationwide. (GM Mem. in Supp. at 5.) Cabela's sells its products in retail stores and through direct marketing using the Internet and mail order catalogs. (Compl. ¶ 8.)

Prior to 1996, Gander Mountain, like Cabela's, sold its inventory at retail stores and through direct marketing using mail order catalogs. In April and May 1996, Gander Mountain and Cabela's entered into three agreements pursuant to which Gander Mountain sold to Cabela's its assets associated with its direct marketing division (the "Transaction"). (Beutz Aff. Exs. A-C.) At the time the parties entered into the Transaction, Gander Mountain was experiencing financial difficulties, and was on the verge of filing for bankruptcy. (See, e.g., Roehr Aff. Ex. 1 ¶ 3.) Both parties were represented by experienced legal counsel in the Transaction; Gander Mountain was represented by Foley & Lardner of Milwaukee, Wisconsin, and Cabela's was represented by Koley, Jessen, Daubman & Rupiper, P.C., of Omaha, Nebraska. (See, e.g., Beutz Aff. Ex. C at 4-5.)

The Transaction included an Asset Purchase Agreement, pursuant to which Gander Mountain sold its inventory and customer lists associated with its direct marketing

division to Cabela's.  (Beutz Aff. Ex. A.)  Cabela's paid Gander Mountain $35 million in the Transaction, of which $20 million was allocated to the purchase of Gander Mountain's inventory, and $7.5 million was allocated to its acquisition of Gander Mountain's customer lists.

The remaining $7.5 million paid to Gander Mountain was allocated to the other two agreements executed in conjunction with the Transaction—the Trademark License Agreement and the Noncompetition Agreement—the agreements at the heart of the dispute now before the Court.  The Trademark License Agreement granted Cabela's "a paid-up, royalty-free, world-wide, exclusive license to use the Trademarks during the term of this license for, and only for, marking, labelling [sic.] and selling goods and services . . . through direct marketing to consumers."  (Id. Ex. B § 1.)  The Trademarks were listed in an attachment to the agreement, and included the trademark GANDER MOUNTAIN and the original Gander Mountain medallion logo.  (Id. Ex. B.)  The license was "limited solely for the Direct Marketing Use of the Trademarks."  (Id. Ex. B § 1.) "Direct Marketing Use" is defined in the agreement as "direct marketing to consumers through paper or other tangible catalogs, electronic catalogs or other electronic media, including specifically without limitation the Internet, telemarketing or any other direct marketing method."  (Id.)

The Trademark Licensing Agreement also provided that Gander Mountain "retains the right to use the Trademarks for all purposes other than the Direct Marketing Use, including, without limitation, the sale of Goods and Services from retail stores operated

3

by [Gander Mountain]." (Id.)  Thus, Gander Mountain's use of its Trademarks in its retail stores remained intact after the Transaction, and continues to this day.  Because Gander Mountain would continue to use the Trademarks in retail stores, and such use would create "an extremely high likelihood of confusion of the public," Cabela's covenanted "not to use the license granted hereby for any purpose except to protect the use of the Trademarks against Direct Marketing Use by other persons and except to the extent that such Trademarks appear on Purchased Inventory."  (Id.)  This covenant, however, would only last until Gander Mountain ceased active retail use of the Trademarks, as defined in the agreement.  The license had a term of four years.  (Id. § 5.)

Gander Mountain also agreed to cease its direct marketing business for a period of seven years.  The Noncompetition Agreement provided that

> neither [Gander Mountain], nor any entity which it controls . . . will directly or indirectly (whether as principal, agent, independent contractor, stockholder, representative, trustee, partner or otherwise) own, manage, operate, control, participate in, perform services for, or otherwise carry on, a direct marketing business involving the sale of hunting, fishing or camping equipment and other outdoor sporting and recreational goods, apparel and services . . . through paper or other tangible catalogs, electronic catalogs or other electronic media, including specifically but without limitation, the Internet, telemarketing or any other direct marketing method or use the Trademarks in connection with any of said activities (the "Direct Marketing Business").

(Beutz Aff. Ex. C § 2.)  The seven-year restriction on Gander Mountain's entry into the Direct Marketing Business existed from the closing date of the Transaction until its expiration on June 6, 2003.  (GM Mem. in Supp. at 4.)

The Noncompetition Agreement also contains a "Contingent Trademark License," the subject of the instant dispute, which provides, in part, that

> [i]n the event Gander Mountain is engaged in active steps to reenter the Direct Marketing Business after the expiration of the seven-year noncompetition period . . . , then Gander Mountain shall notify Cabela's . . . and Cabela's shall have the right to purchase from Gander Mountain for the sum of $1,000 a perpetual, exclusive license free and clear of all Liens to use the Trademarks in connection with [Cabela's] Direct Marketing Business.

(Beutz Aff. Ex. C § 3.) It also provides that "[s]uch license shall be evidenced by a separate written agreement in form and content customary to licenses of the type described above." (Id.) The Contingent Trademark License also provides that if Gander Mountain ceased its retail operations, Cabela's would have the right to purchase the Trademarks under certain circumstances. (Id.)

As noted above, at the time the parties entered into the Transaction, Gander Mountain was experiencing financial difficulties, and was on the verge of filing for bankruptcy. In late 1996 or 1997[1], Holiday StationStores, Inc. ("Holiday"), purchased the assets of Gander Mountain's Retail Division in a bankruptcy proceeding. (Roehr Aff. Ex. 1 ¶ 10.) Cabela's appeared in the bankruptcy proceedings specifically to ensure that the agreements executed pursuant to the Transaction were transferred to Holiday in the sale. (Id.)

---

[1] The record does not contain a more specific date regarding when the bankruptcy proceeding took place.

5

Gander Mountain "is now engaged in actions . . . that have satisfied or will satisfy the definition of 'active steps to reenter the Direct Marketing Business' contained in the [Contingent Trademark License]." (GM Mem. in Supp. at 7.) Gander Mountain brought this action in July 2004 seeking a declaratory judgment that "insofar as [the Contingent Trademark License] purports to grant Cabela's the right to purchase a perpetual license for the sum of $1,000, it is an unreasonable and unenforceable perpetual extension of the seven-year covenant not to compete in a Direct Marketing Business or, in the alternative and if appropriate, judicial modification thereof." (Compl. at 6.)

At the same time that it filed this action, Gander Mountain commenced an arbitration proceeding with respect to the issues now before the Court pursuant to an arbitration clause in the Noncompetition Agreement. On September 20, 2004, "in light of the ongoing arbitration proceeding between the parties," this action was stayed. (Doc. No. 20.) On January 6, 2005, the arbitrators ruled "that the enforceability of the agreement and the scope of the noncompetition obligation are not arbitrable issues." (GM's Mem. in Supp. at 7.) On June 2, 2005, the stay was lifted (Doc. No. 33), and the parties' cross motions for summary judgment followed.

**Standard of Review**

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50

(1986). The moving party bears the burden of showing that the material facts in the case are undisputed. See Celotex, 477 U.S. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. See Anderson, 477 U.S. at 256; Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**Analysis**

    **A.**    **The Arguments of the Parties and the Applicable Law**

Gander Mountain argues that the Contingent Trademark License "is unquestionably a perpetual noncompetition obligation disguised as a trademark license." (GM Mem. in Supp. at 10.) It relies on the line of Wisconsin precedent[2] holding "that clauses requiring the forfeiture of rights as a penalty for competition are, in fact, covenants not to compete." (Id. at 11.) Under Wisconsin law, "[i]f a covenant not to

---

[2] The agreements executed pursuant to the Transaction are governed by Wisconsin law. (See, e.g., Beutz Aff. Exs. A-C.)

compete is unreasonable, it is unenforceable." Reiman Assoc., Inc. v. R/A Advertising, Inc., 306 N.W.2d 292, 295 (Wis. App. 1981) (citations omitted). According to Cabela's, however, Gander Mountain "could have entered the Direct Marketing Business in June of 2003—just without the use of the Trademarks." (Cabela's Mem. in Supp. at 12.) Thus, Cabela's asserts that "Gander Mountain is now free to compete in the Direct Marketing Business with Cabela's. The only thing Gander Mountain cannot do is use the Trademarks." (Cabela's Reply Mem. at 10.)

In determining whether a covenant not to compete ancillary to the sale of a business is reasonable under Wisconsin law, the Court must examine whether the covenant is "(1) reasonably necessary for the protection of the beneficiary; (2) reasonable as between the parties, and particularly as to the party restrained, considering time, space, purpose, and scope; and (3) not specially injurious to the public." Id. (citation omitted). "Covenants not to compete incidental to the sale of a business are not subject to exacting scrutiny, particularly where . . . the covenants contain no restriction on the right of the restrained party to enter employment." Id. (citation omitted). The Wisconsin courts have considered the fact that "the covenant was part of the consideration [in a business deal], and without it, [the enforcing corporation] doubtlessly could have and would have commanded more monetary consideration." Id. at 297.

As opposed to noncompetition agreements ancillary to the sale of a business, restrictive covenants in <u>employment contracts</u> are governed by Wis. Stat. § 103.465.[3] "[T]he explicit purpose of § 103.465, as plainly stated in the statute, is to invalidate covenants that impose unreasonable restraints on <u>employees</u>." <u>Heyde Companies, Inc. v. Dove Healthcare, LLC</u>, 654 N.W.2d 830, 834 (Wis. 2002) (emphasis added). The determination of whether § 103.465 applies to a given contract is not dependant on the semantics of the agreement, but on its effect on the restricted party. <u>See id.</u> at 834-35.

Within the context of employer-employee agreements, the Wisconsin courts have uniformly held that "agreements that condition [payment of a penalty] on going to work for the exemployer's rival" are subject to the same scrutiny as agreements forbidding competition outright. <u>Heder v. City of Two Rivers, Wis.</u>, 295 F.3d 777, 780 (7th Cir. 2002) (applying Wisconsin law). However, "Wisconsin applies Stat. § 103.465 only to the extent that a consequence is linked on <u>working for a competitor</u>." <u>Id.</u> (emphasis added).

Gander Mountain's position in this action is based on its contention that the Contingent Trademark License imposes a penalty on Gander Mountain for competing, and this aspect of the agreement transforms the clause into a noncompete provision under Wisconsin law. According to Gander Mountain, "[t]he punishment to Gander Mountain

---

[3]Under this statute, "[a] restrictive covenant must: (1) be necessary to protect the employer; (2) provide a reasonable time limit; (3) provide a reasonable territorial limit; (4) not be harsh or oppressive to the employee; and (5) not be contrary to public policy." <u>Heyde Companies, Inc. v. Dove Healthcare, LLC</u>, 654 N.W.2d 830, 835 (Wis. 2002).

if it tries to compete (a direct competitor gaining rights to the mark GANDER MOUNTAIN, the company's corporate name and symbol) would have unthinkable company-wide implications." (GM Reply Mem. at 4.) It urges that "the price of placing this asset in the hands of Cabela's—to do with it what it likes—is impossibly high." (Id.)

Contrary to Gander Mountain's position, Cabela's argues that the Contingent Trademark License is not a noncompetition agreement, but is a valid contractual provision, entered into between sophisticated parties, governing the use of the Trademarks. "[T]rademark agreements, in which two parties agree on their respective rights in a mark, are favored under the law." Times Mirror Magazines, Inc. v. Field & Stream Licenses Co., 294 F.3d 383, 395 (2nd Cir. 2002) (internal quotation omitted); see also Clorox Co. v. Sterling Winthrop, Inc., 117 F.3d 50, 55 (2nd Cir. 1997) (noting that trademark agreements "are common, and favored, under the law" (citations omitted)). "[T]he parties' determination of the scope of needed trademark protections is entitled to substantial weight." Clorox Co., 117 F.3d at 60. Accordingly, "it is usually unwise for courts to second-guess" the parties' decisions regarding their respective rights under their trademarks. Id. Thus, according to Cabela's, because Wisconsin noncompete law does not apply to the Contingent Trademark License, Gander Mountain's argument that it is an invalid contractual provision is without merit.

### B.     The Scope of the Issue Presented

Before analysis of the substantive arguments of the parties, it is important to note that in considering whether the Contingent Trademark License is a noncompete

agreement, the issue presented to the Court is a very narrow one. The Court has not been asked to determine the scope of the Contingent Trademark License or the parties' respective rights thereunder. The parties, however, have espoused divergent positions as to their interpretations of the agreement.[4]

The Contingent Trademark License provides that, in the event the provision is triggered, the "license shall be evidenced by a separate written agreement in form and content customary to licenses of the type described above." (Beutz Aff. Ex. C § 3.) Therefore, the contours of the rights of the parties under the Contingent Trademark License are left undefined by the Noncompetition Agreement. However, the Trademark License Agreement, which the parties executed in conjunction with the Noncompetition Agreement, provided that

> unless and until [Gander Mountain] ceases active Retail Use of the Trademarks, [Cabela's] hereby covenants and agrees not to use the license granted hereby for any purpose except to protect the use of the Trademarks against Direct Marketing Use by other persons and except to the extent that such Trademarks appear on Purchased Inventory.

---

[4]Gander Mountain has advanced its view that, under the provision, Cabela's will be able to use the Trademarks in any way it pleases, suggesting that Cabela's may actually utilize the Trademarks in its own Direct Marketing Business. (See, e.g., GM Reply Mem. at 4.) In contrast, Cabela's argues that the provision only prohibits Gander Mountain's "use of the Trademarks" and "[t]he only thing Gander Mountain cannot do is use the Trademarks [in its Direct Marketing Business]." (Cabela's Reply Mem. at 10, 13.)

(Id. Ex. B § 1.)  Accordingly, the Court determines that, to the extent Gander Mountain's position is based on its contentions regarding Cabela's potential use of the Trademarks, its fears are belied by the history of negotiated agreements between the companies.

To the Court's knowledge, there have been no attempts to fashion an agreement regarding Gander Mountain's Direct Marketing Business and the details of the Contingent Trademark License, which leaves the rights of the parties under the provision largely undefined.  The Court will not, however, adopt Gander Mountain's extreme reading of the incomplete provision for the sole purpose of invalidating it, where that provision provides for the parties to further define their rights thereunder.  Cabela's only interest appears to be in preventing Gander Mountain's use of the Trademarks in the Direct Marketing Business.  (See GM Reply Mem. at 10 (noting that Cabela's motivation is to assure that the Trademarks would not be used in the Direct Marketing Business).)  According to Cabela's, "Gander Mountain bargained away its right to use the Trademarks in connection with the Direct Marketing Business."  (Cabela's Mem. in Supp. at 17.)

"When there is a choice among plausible interpretations [of a contract], it is best to choose a reading that makes commercial sense, rather than a reading the makes the deal one-sided."  Baldwin Piano, Inc. v. Deutsche Wurlitzer GMBH, 392 F.3d 881, 883 (7th Cir. 2004).  Here, the Court determines that, for the purposes of the instant Motions, the most reasonable reading of the Contingent Trademark License is the one espoused by Cabela's—that pursuant to the sale of Gander Mountain's Direct Marketing Business to Cabela's, Gander Mountain agreed not to use its Trademarks in the Direct Marketing

12

Business.  This is the interpretation supported by the agreements that the parties entered into pursuant to the Transaction.  See, e.g., Harris v. Metropolitan Mall, 334 N.W.2d 519, 523 (Wis. 1983) (instruments executed at the same time between the same contracting parties in the course of the same transaction will be construed together).  Having come to this conclusion, the Court will consider the substantive arguments of the parties.

### C. Construing the Contingent Trademark License

The Court determines that the Contingent Trademark License is just that—an agreement providing for the license of the Trademarks in certain situations.  That one provision of the Contingent Trademark License is triggered by "Gander Mountain engag[ing] in active steps to reenter the Direct Marketing Business" does not change this conclusion.  Gander Mountain's argument that the Contingent License Agreement is an invalid noncompete agreement because it acts as a penalty to Gander Mountain's reentry into the Direct Marketing Business fails for numerous reasons.

First, the companies are presently engaged in competition with each other, and the Contingent Trademark License will have no effect on that competition.  There is no dispute that Gander Mountain and Cabela's are direct competitors in the retail divisions of their businesses.  Therefore, whether or not Gander Mountain determines, in its business judgment, that it can re-enter the Direct Marketing Business under the Contingent Licensing Agreement, it remains in vigorous competition with Cabela's.  While the Contingent Trademark License may limit Gander Mountain's competition, this is not inconsistent with the nature of trademark licensing agreements generally.  See, e.g.,

13

Clorox Co., 117 F.3d at 57 (validating trademark agreement under the antitrust laws where the "agreement at issue . . . does no more than regulate how the [trademark] may be used"). Even if "the restrictions in the agreement prevent [Gander Mountain] from competing as effectively as it otherwise might" the agreement does not prevent competition altogether. Id. at 59. Accordingly, the fact that the provision does not restrict the ongoing competition between the companies in their retail stores weighs against its construal as a noncompete provision.

Second, there is no dispute that Gander Mountain was facing imminent bankruptcy at the time of the Transaction, and that it benefitted greatly from the financial boost provided by Cabela's $35 million cash infusion. The Court notes that "[a]t the time of the execution of such [a trademark] agreement, the parties are in the best position to determine what protections are needed." Id. at 60. The fact that the Transaction was "freely entered" by Gander Mountain, and that Gander Mountain was compensated in conjunction therewith, counsels against the Court invalidating the agreement. See id.; see also Klipsch, Inc. v. WWR Tech., Inc., 127 F.3d 729, 737 (8th Cir. 1997) (upholding forfeiture clause in a licensing agreement where the parties "were all represented by counsel and freely agreed to the clear and unambiguous language contained in the termination provision"). To the extent that Gander Mountain is wounded by the enforcement of the Contingent Trademark License, its wounds are self-inflicted. See Clorox Co., 117 F.3d at 59 (noting that, "[a]lthough [the plaintiff's] predecessor may not have struck the best bargains when negotiating the trademark agreements with the

previous [trademark] owners" the plaintiff's antitrust claims attempting to invalidate the trademark agreement failed).

Finally, even if Gander Mountain is correct that the Contingent Trademark License imposes on it some version of a penalty for competition, Gander Mountain has not provided the Court with any authority that such a penalty would be treated as a noncompete agreement under Wisconsin law where, as here, it is entered into incident to the sale of a business.[5]  It is clear that the Wisconsin courts have determined that agreements entered into between an employer and employee that penalize an employee for finding other employment or competing in some way are not favored under the law. See, e.g., Equity Enterprises, Inc. v. Milosch, 633 N.W.2d 662, 668 (Wis. Ct. App. 2001) (holding that noncompetition clause requiring employee to forfeit his rights to "renewal commissions" if he engaged in certain competitive practices was invalid as an unreasonable restraint on trade).  That is not, however, this agreement.  Here, the Contingent Trademark License provides that, if Gander Mountain chooses to reenter the Direct Marketing Business, it must enter into a licencing agreement with Cabela's

---

[5] At oral argument, Gander Mountain relied on Corporate Express Office Prods. v. Brown, 2001 WL 34381111 (July 18, 2001 W.D. Wis.), as support for its position that the Contingent Trademark License should be excised from the Noncompetition Agreement if it is found to be an unreasonable covenant not to compete.  The Court need not, however, reach the issue of what the appropriate remedy would be if Gander Mountain were to prevail on its Motion for Summary Judgment.

regarding its Trademarks.[6]  That Gander Mountain is forced to enter into a licensing agreement with Cabela's if it wishes to enter into a specific sector of the market—which it anticipates will be to its detriment—does not transform the Contingent Trademark License into a covenant not to compete.[7]

This consideration is especially relevant considering that Wisconsin applies a more deferential level of review to agreements entered into pursuant to the sale of a business[8],

---

[6]At oral argument, Gander Mountain argued that the Contingent Trademark License is not a trademark license because "at most [the provision] contains within it an agreement to agree on a trademark license at a future time." (Audio Tape: Oral Argument 8/3/05.)  Gander Mountain's statement, however, makes clear its view that the Contingent Trademark License does not preclude the parties from further defining their respective rights under the provision.

[7]The Court notes that the Seventh Circuit has restricted the application of Wisconsin noncompete law in certain situations.  In Heder, 295 F.3d at 780, for example, the court held that Wis. Stat. § 103.465 (governing employer-employee noncompetition agreements) did not apply to a collective bargaining agreement that obligated employees to reimburse the employer for certain training expenses if the employee left the employment within a certain period of time.  Id. at 778, 780.  The court noted that §103.465 is limited "to agreements that condition repayment on going to work for the exemployer's rival." Id. at 780.  It further noted that, while the agreement at issue shared "with genuine restrictive covenants the feature that it makes changing jobs costly . . . that is not enough to throw a contract out the window." Id.
In IDX Sys. Corp. v. Epic Sys. Corp., 285 F.3d 581, 585 (7th Cir. 2002), the Seventh Circuit also declined to apply Wisconsin law governing noncompetition clauses between employers and employees to agreements prohibiting the disclosure of trade secrets.  Id.  The Court noted that "Wisconsin allows a much greater scope of restraint in contracts between vendor and vendee than between employer and employee." Id. (internal quotation omitted).  While neither of these cases is directly on point here, the cases do indicate that Wisconsin noncompete law should not necessarily be applied to any agreement that may adversely affect competition.

[8]As noted above, under Wisconsin law, "[c]ovenants  not to compete incidental to the sale of a business are not subject to exacting scrutiny, particularly where . . . the covenants contain no restriction on the right of the restrained party to enter employment."

and the Transaction between Gander Mountain and Cabela's was a business deal conducted at arm's length between two sophisticated parties represented by experienced legal counsel.  Thus, concerns regarding unequal bargaining power between employers and employees, Gary Van Zeeland Talent, Inc. v. Sandas, 267 N.W.2d 242, 251 (Wis. 1978), or the tying up of "human capital," IDX Sys. Corp. v. Epic Sys. Corp., 285 F.3d 581, 585 (7th Cir. 2002) (applying Wisconsin law), do not apply here.  The Transaction cost Cabela's $35 million, $7.5 million of which was allocated to the Licensing and Noncompetition agreements.  "[P]ermitting [a company] the full return on its investment [in its purchases or products] is essential to promote investment in productive assets and rivalry with other [companies]."  Id.  Accordingly, as the Court has determined that the Contingent Trademark License is not an unenforceable covenant not to compete, the Court will deny Gander Mountain's Motion for Summary Judgment, grant Cabela's Motion for Summary Judgment, and dismiss Gander Mountain's Complaint.

## Conclusion

Based on the foregoing, and all of the files, records and proceedings herein, it is **ORDERED** that Gander Mountain's Motion for Summary Judgment (Doc. No. 36) is **DENIED**, Cabela's Motion for Summary Judgment (Doc. No. 43) is **GRANTED**, and Gander Mountain's Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE**.

---

Reiman Assoc., Inc., 306 N.W.2d at 295 (citation omitted).  The Wisconsin courts have considered the fact that "the covenant was part of the consideration [in a business deal], and without it, [the enforcing corporation] doubtlessly could have and would have commanded more monetary consideration." Id. at 297.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: August 18 , 2005                                    s/Richard H. Kyle
                                                           RICHARD H. KYLE
                                                           United States District Judge