UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

GANDER MOUNTAIN COMPANY,                 Case No. 04-CV-3125 (PJS/RLE)

                Plaintiff,

v.                                       MEMORANDUM OPINION AND ORDER

CABELA'S, INC.,

                Defendant.

---

Dudley W. Von Holt, THOMPSON COBURN LLP, for plaintiff.

Michael C. Cox, KOLEY JESSEN PC, for defendant.

This case is a dispute between two business rivals — plaintiff Gander Mountain, Inc. ("Gander Mountain") and defendant Cabela's, Inc. ("Cabela's") — over whether Gander Mountain may use its most important trademarks (including the name "Gander Mountain" and Gander Mountain's familiar flying-goose logo) in marketing directly to consumers, including over the Internet, through mail-order catalogs, and through television "infomercials."  Both parties have moved for summary judgment on Cabela's counterclaims, which are the only claims remaining in this action.[1]  For the reasons set forth below, Gander Mountain's motion is granted, Cabela's motion is denied, and Cabela's counterclaims are dismissed with prejudice.  Gander Mountain is free to use its trademarks in all respects, including in direct marketing to consumers.

---

[1]The Court previously dismissed Gander Mountain's complaint.  *See* Docket No. 54.

I.

This action arises out of a 1996 transaction between Gander Mountain[2] and Cabela's.  At the time of the transaction, Gander Mountain was experiencing severe financial difficulties and was about to file for bankruptcy.  The 1996 transaction involved several separate agreements:

First, Cabela's agreed to buy all of the assets of Gander Mountain's catalog division.

Second, Gander Mountain and Cabela's entered a Noncompetition Agreement.  Under that agreement, Gander Mountain agreed not to compete with Cabela's in the "direct marketing" business for a period of seven years.  In essence, Gander Mountain agreed that it would sell products only through its retail stores and not by marketing directly to consumers through the Internet, through mail-order catalogs, or through similar means.

Third, Cabela's purchased a license to use Gander Mountain's trademarks in the direct-marketing business for four years ("the 1996 License").  Cabela's agreed that it would not actually use Gander Mountain's trademarks in marketing to consumers, but would instead use its rights under the license to keep *others* from using the trademarks in direct marketing.  In other words, what Cabela's got for its money was not the right to market products under the Gander Mountain name.  Rather, Cabela's got the right not to have to *compete* against Gander Mountain trademarks in the direct-marketing business for four years.

Finally, and most importantly for purposes of this action, the parties agreed on a Contingent Trademark License ("CTL"), which appeared in the broader Noncompetition Agreement.  Under the CTL, if Gander Mountain decided to resume direct marketing to

_____

[2]The 1996 transaction was actually between a predecessor of Gander Mountain and Cabela's, but, for the sake of simplicity, the Court will refer to Gander Mountain and its predecessor collectively as "Gander Mountain."

consumers after expiration of the seven-year non-compete period, Cabela's would have the right

to purchase for $1,000 a perpetual, exclusive license to the Gander Mountain trademarks — the

same trademarks that were the subject of the four-year license.  The CTL provides in relevant

part:

> **3.  Contingent Trademark License.** **(a)**  In the event
> Gander Mountain is engaged in active steps to reenter the Direct
> Marketing Business after the expiration of the seven-year
> noncompetition period provided in Section 2, then Gander
> Mountain shall notify Cabela's in writing and Cabela's shall have
> the right to purchase from Gander Mountain for the sum of $1,000
> a perpetual, exclusive license free and clear of all Liens to use the
> Trademarks in connection with its Direct Marketing Business . . . .
> Such license shall be evidenced by a separate written agreement in
> form and content customary to licenses of the type described
> above. . . .

Pl.'s Mem. Supp. Summ. J. Ex. E § 3(a).  The parties stipulated that all of these agreements —

including the CTL — would be governed by Wisconsin law.

Gander Mountain concedes that it has "engaged in active steps" to reenter the direct-

marketing business, thus triggering Cabela's right to purchase a perpetual, exclusive license to

the Gander Mountain trademarks for $1,000.  But Gander Mountain has refused to grant such a

license to Cabela's because, Gander Mountain contends, the CTL is unenforceable.  Cabela's

disagrees.  It has tendered to Gander Mountain the sum of $1,000, as well as a draft license

agreement that, according to Cabela's, meets the requirements of the CTL.  In its counterclaims,

Cabela's seeks an order requiring Gander Mountain to accept its $1,000 and execute the draft

license agreement, which the parties refer to as the "Highby agreement."  Cabela's also seeks a

declaration that the CTL is valid and enforceable and an injunction prohibiting Gander Mountain

from using the trademarks, or any confusingly similar marks, in the direct-marketing business.

II.

The dispute between the parties centers on the provision of the CTL that requires the perpetual, exclusive trademark license to be "evidenced by a separate written agreement in form and content customary to licenses of the type described above."  The parties strongly dispute the meaning of those words.  Gander Mountain argues that "customary to licenses of the type described above" refers to what is customary to perpetual, exclusive trademark licenses *generally*.  In other words, Gander Mountain argues that, to determine what is "customary to licenses of the type described above," a court would have to look at *lots* of perpetual, exclusive trademark licenses, and identify what is customary to such licenses.  Cabela's argues that "customary to licenses of the type described above" refers to what is customary to trademark licenses *issued by Gander Mountain to Cabela's*.  In other words, Cabela's argues that, to determine what is "customary to licenses of the type described above," a court would have to look at one and only one license — the 1996 License, which is the only license ever purchased from Gander Mountain by Cabela's.

Cabela's position cannot be reconciled with the language of the CTL.  If, as Cabela's insists, the parties intended to provide that, in form and content, the perpetual license should be similar to the 1996 License, the parties very easily could have done so.  The parties could have agreed, for example, that "[s]uch license shall be evidenced by a separate written agreement in form and content similar to the Trademark License Agreement dated May 16, 1996."

But the parties did nothing like that.  Instead, they provided that the perpetual license "shall be evidenced by a separate written agreement in form and content customary to licenses of the type described above."  Several aspects of the parties' choice of words are significant:

- The parties referred to "licenses" — plural.  The parties did not refer to a license — singular.

- The parties referred to licenses "of [a] type."  "Type" refers not to one particular license, but to a class or category of licenses.

- The parties referred to what was "customary."  A "custom" emerges over time, from many examples.  Gander Mountain and Cabela's had only one prior license agreement between them.

- The parties referred to licenses of the type "described above."  The only license "described above" is "a perpetual, exclusive license."  Nowhere "above" does the agreement describe the 1996 License.

In short, it is inconceivable that Gander Mountain and Cabela's — sophisticated parties represented by sophisticated counsel — would have chosen this language to refer to the 1996 License.  Had that been their intent, they would not have used "customary" (as one prior agreement does not make a custom), they would not have used the plural "licenses" (they would have used the singular "license" or, even more likely, simply identified the 1996 License), they would not have referred to a "type" of license (but rather to just a single license), and they would not have referred to licenses "described above" (given that the only license "described above" was perpetual, and the 1996 License was not perpetual).

In arguing that, notwithstanding the clear language to the contrary, the CTL refers to the 1996 License, Cabela's points to extrinsic evidence of the parties' intent, the purpose of the contract, and the sophistication of the parties — in short, to almost everything except the language of the contract.  For example, Cabela's argues that the purpose of the CTL was to

ensure that Cabela's never again had to compete with Gander Mountain's trademarks in the direct-marketing business.  Indeed, Cabela's says, it originally wanted to purchase the trademarks outright.[3]

Cabela's arguments do not shed much light on what is meant by the phrase "customary to licenses of the type described above."  For example, even if Cabela's is correct that the purpose of the CTL was to ensure that Cabela's never again had to compete with Gander Mountain's trademarks in the direct-marketing business, that purpose would be accomplished either by a perpetual license that took its form and content from the 1996 License or by a perpetual license that took its form and content from perpetual, exclusive trademark licenses generally.  Knowing the purpose of the CTL does not answer the question of what the "customary to licenses" provision means.

More importantly, Cabela's arguments ask the Court to ignore the written terms of the CTL and to enforce instead a subjective intention that is contradicted by the contract.  This the Court cannot do.  Wisconsin law is clear:

> The cornerstone of contract interpretation is to ascertain the parties' true intentions *as expressed by the contractual language*. The purpose of judicial construction is to determine what the parties contracted to do *as evidenced by the language they used*. Where the terms of a contract are plain and unambiguous, we construe the contract as it stands.

_____

[3]According to Cabela's, although it originally wanted to purchase Gander Mountain's trademarks outright, the parties realized that Gander Mountain needed to retain ownership of the trademarks in order to liquidate its remaining assets.  As an alternative to a sale of the trademarks, the parties structured the agreement to include a four-year license to the trademarks, with an option for Cabela's to purchase a perpetual license to the same trademarks at the end of the seven-year noncompetition term.

*Bank of Barron v. Gieseke*, 485 N.W.2d 426, 432 (Wis. Ct. App. 1992) (emphasis added; citations omitted); *see also State* ex rel. *Journal/Sentinel, Inc. v. Pleva*, 456 N.W.2d 359, 362 (Wis. 1990) ("[T]he cornerstone of contract construction is to ascertain the true intentions of the parties as expressed by the contractual language. . . . [T]he purpose of judicial construction is to determine what the parties contracted to do as evidenced by the language they saw fit to use.").

Even if the Court found that Cabela's arguments regarding the parties' subjective intention were compelling, the Court could not ignore the language of the CTL. That language, in referring to "customary to licenses of the type described above," is plainly inconsistent with the notion that the parties meant to refer only to the 1996 License. The Court therefore holds, as a matter of law, that "a separate written agreement in form and content customary to licenses of the type described above" means "a separate written agreement in form and content customary to perpetual, exclusive trademark licenses generally," and not "a separate written agreement in form and content similar to the 1996 License."

### III.

Gander Mountain next argues that, although the parties agreed that "customary to licenses of the type described above" meant customary to perpetual, exclusive trademark licenses generally, the parties did not agree on what terms *are* customary to perpetual, exclusive trademark licenses generally. Gander Mountain points out that nothing in the CTL itself provides guidance on what terms are customary. Gander Mountain further points out that the record is bereft of any extrinsic evidence that the parties ever reached an understanding about what is the customary form and content of perpetual, exclusive trademark licenses. To the contrary, Gander Mountain says, the parties have been unable to agree on the terms of a

perpetual, exclusive trademark license, suggesting that they had different understandings of what was customary.  Gander Mountain argues that, on the record before the Court, no reasonable jury could find that the parties reached a meeting of the minds on the form and content of the perpetual, exclusive trademark license that Gander Mountain was supposed to sell to Cabela's.

Under *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), Gander Mountain's argument places the burden on Cabela's to "go beyond the pleadings," and, "by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial,'" *id.* at 324 (quoting Fed. R. Civ. P. 56(e)).  In other words, to avoid having summary judgment entered against it, Cabela's must submit evidence from which a jury could determine what the parties had in mind when they referred to a written agreement that was, in form and content, customary to perpetual, exclusive trademark licenses.  For example, Cabela's could offer objective evidence that perpetual, exclusive trademark licenses follow a well-known form and have a well-known content — that someone experienced in buying, selling, or negotiating such licenses would know exactly what is the customary form and content of such licenses.  *See Bondy v. Harvey*, 62 F.2d 521, 522, 524 (2d Cir. 1933) (reversing the grant of a motion to dismiss and holding that a lease agreement that included "usual and proper covenants" could be enforceable under Wisconsin law if there was evidence from which a jury could determine those covenants).  Alternatively, Cabela's could offer evidence that the parties themselves had a subjective understanding about what form and content are customary to perpetual, exclusive trademark licenses.  *See Metro. Ventures, LLC v. GEA Assocs.*, 717 N.W.2d 58, 66-67 (Wis. 2006) (where a term in a written agreement is too

vague to be enforceable, the parties' subsequent conduct and practical interpretation can cure this defect by evidencing the parties' intent).

Cabela's has not submitted any evidence — either objective or subjective — that the parties reached an agreement on the form and content that is customary to perpetual, exclusive trademark licenses.  Cabela's can do no more than rely on its argument that the parties intended that the new perpetual trademark license would take its form and content from the 1996 License. The Court has already rejected this argument as being impossible to reconcile with the words used in the CTL.  Moreover, the 1996 License provides scant evidence of what is customary to perpetual, exclusive trademark licenses generally for the simple reason that the 1996 License was *not* a perpetual, exclusive trademark license, but rather was a short-term license designed to address a unique set of circumstances.

That Cabela's has no evidence of what is customary to perpetual, exclusive trademark licenses generally is not surprising.  From the beginning of this litigation, Cabela's has insisted that "customary to licenses of the type described above" referred to the 1996 License and to the 1996 License alone.  Cabela's has been single-minded in its pursuit of that argument, going so far as to decline to take discovery from Gander Mountain on what is customary to perpetual, exclusive trademark licenses generally, and to resist any attempt by Gander Mountain to take discovery from Cabela's on the same question.  Cabela's put all of its eggs in one basket, and, as a result, it cannot now point to any evidence as to what the parties intended in referring in the CTL to a written agreement in form and content customary to perpetual, exclusive trademark licenses generally.

The closest Cabela's comes to offering such evidence is the report of its expert, John P. Passarelli.  In that report, Passarelli opines that the Highby agreement is "in form and content customary to licenses of the type described in [the CTL]."  Pl.'s Mem. Opp. Cabela's Mot. Protective Order Ex. H ¶ 1 [Docket No. 141-9].  Passarelli does not explicitly define what he means by "licenses of the type described in [the CTL]," but his report as a whole suggests that his definition is the same as Cabela's — i.e., that when he refers to "in form and content customary to licenses of the type described in [the CTL]," he means "in form and content similar to the 1996 License."  For example, while Passarelli states that no material terms remain to be negotiated, he also explains that this is because the parties' previous contracts together establish all of the material terms and conditions of the perpetual, exclusive trademark license.  *Id.* ¶ 10. Similarly, Passarelli states that the parties' previous contracts document the parties' rights and obligations with respect to the perpetual, exclusive trademark license and evidence a meeting of the minds regarding the essential terms of that license.  *Id.* ¶¶ 12, 14.  In other words, when Passarelli states that the Highby agreement is "in form and content customary to licenses of the type described in [the CTL]," he is stating that the Highby agreement is in form and content similar to the 1996 License, not that it is in form and content similar to perpetual, exclusive trademark licenses generally.

In sum, Cabela's has failed to offer any evidence of what is customary to perpetual, exclusive trademark licenses generally — and thus Cabela's has failed to offer any evidence

contradicting Gander Mountain's claim that the parties simply failed to reach a meeting of the minds on what form and content the perpetual, exclusive trademark license would take.[4]

IV.

Gander Mountain next argues that, because the parties did not agree on the form and content of the perpetual, exclusive trademark license that Cabela's could purchase, the CTL is nothing more than an agreement to agree — that is, an agreement between Gander Mountain and Cabela's to negotiate a perpetual, exclusive trademark license in the future. Under Wisconsin law, agreements to agree are generally unenforceable. *See Dunlop v. Laitsch*, 113 N.W.2d 551, 554 (Wis. 1962) (an agreement to make a future agreement is not enforceable, because there has been no meeting of the minds as to the essential terms); *Goldstine v. Tolman*, 147 N.W. 7, 10-13 (Wis. 1914) (holding that no contract was formed where, in addition to a number of specific terms, the parties agreed to include "the usual terms as applied to a ninety-nine year lease").

Cabela's contends, however, that the failure to agree on one or more terms in a contract is not necessarily fatal to the enforcement of that contract. According to Cabela's, Wisconsin will uphold a contract that is definite in most details if the court can fill in the missing terms. *See*

---

[4]Even if Passarelli's report could be read to state that either the 1996 License or the Highby agreement contain terms that are customary to perpetual, exclusive trademark licenses in general, the only documents upon which Passarelli could base this conclusion (other than documents filed in this case) are "Form License Agreements," which Passarelli alludes to but does not describe in any way. *See* Pl.'s Mem. Opp. Cabela's Mot. Protective Order Ex. H at Ex. A. For expert testimony to be admissible, Fed. R. Evid. 702 requires that it be based upon sufficient facts or data. Clearly, Passarelli cannot rely only on the documents filed in this case to tell him whether the 1996 License or the Highby agreement contain terms customary to perpetual, exclusive trademark licenses, and the reference to Passarelli's review of "Form License Agreements" is too vague to indicate whether Passarelli relied upon sufficient facts or data to come to such a conclusion. *See Henthorn v. Capitol Commc'ns, Inc.*, 359 F.3d 1021, 1026 (8th Cir. 2004) (only admissible evidence can defeat a summary-judgment motion).

*Depies-Heus Oil Co. v. Sielaff*, 16 N.W.2d 386, 389 (Wis. 1944) ("'Where a contract is definite

in the main features thereof, and in most of its details, but one item is left in such condition that

an inquiry of reasonable value or reasonable time for performance is essential that will not defeat

the whole contract or bar specific performance.'" (quoting *Kipp v. Laun*, 131 N.W. 418, 422

(Wis. 1911)); *Herder Hallmark Consultants, Inc. v. Regnier Consulting Group, Inc.*, 685 N.W.2d

564, 567-68 (Wis. Ct. App. 2004) (holding that the transfer of the business's assets and the

parties' course of negotiations was sufficient evidence to find that the parties agreed to a

reasonable, or market, price for the business, which could be fixed by a jury); *Lambert Corp. v.*

*Evans*, 575 F.2d 132, 137 (7th Cir. 1978) (applying Wisconsin law and rejecting the argument

that omitted terms invalidated the contract because there was no showing that the parties failed

to agree on "any terms of any real consequence").

Cabela's is correct that, in this case, the parties have agreed to a number of specific terms

of the license — including what are presumably the most important terms, such as the precise

trademarks covered by the license, the price of the license ($1,000), the term of the license

(perpetual), and the nature of the license (exclusive).[5]  But *Depies-Heus* and *Herder* do not stand

for the principle that, if the parties have agreed on most terms — even the most important terms

— the Court can simply take pen in hand and fill in any missing terms in order to make the

---

[5]Indeed, in denying Gander Mountain's motion for a preliminary injunction in a related
case, this Court found that Gander Mountain was unlikely to succeed in invalidating the contract
because it appeared that the parties had already agreed to the main terms of the license.  *See*
*Gander Mountain Co. v. Cabela's, Inc.*, No. 06-CV-2857, 2006 WL 2788184, at *3 (D. Minn.
Sept. 26, 2006).  The Court made clear, however, that its ruling was limited to the procedural
context of the preliminary-injunction motion, and that, after discovery closed and the issue was
fully briefed, the Court might very well decide that its first impression was not correct.  That is
exactly what has happened.

contract enforceable.  In both *Depies-Heus* and *Herder*, there was a principled method for supplying the missing terms:  Either the contract itself included a method for supplying the missing term (*Depies-Heus*, 16 N.W.2d at 386-87) or the only missing term was the price, which the parties had agreed would be "reasonable," and which could be determined by evidence of a reasonable market price (*Herder*, 685 N.W.2d at 567-68).

In contrast, the CTL provides no method by which the customary form and content of perpetual, exclusive trademark licenses can be determined.  Moreover, as discussed above, Cabela's has submitted no evidence that the parties reached a meeting of the minds on what form and content are customary.  The parties cannot even agree about what issues are customarily *addressed* in a perpetual, exclusive trademark license, much less about *how* those issues are addressed.

Finally, Cabela's argues that the CTL is enforceable because it contains all the terms material to a trademark license, citing *Liberto v. D.F. Stauffer Biscuit Co.*, 441 F.3d 318 (5th Cir. 2006).  Putting aside the fact that *Liberto* applied Texas law (which is not relevant here), *Liberto* did not purport to catalog all of the essential terms of a trademark license.  Rather, *Liberto* simply held that the particular license before the court was unenforceable because it did not contain certain essential terms.  *Id.* at 324-25.  Indeed, read carefully, *Liberto* actually supports Gander Mountain's position:  One of the omitted terms that the *Liberto* court found essential was a termination clause.  In this case, the CTL says nothing about a termination clause.  Cabela's contends that such a clause is unnecessary because the license that it is entitled to purchase is perpetual, while Gander Mountain argues that even a perpetual license must specify the circumstances under which either party may terminate it (such as if one party breaches the

-13-

license or files for bankruptcy).  On *Liberto*'s reasoning, then, Gander Mountain and Cabela's have failed to agree on a material term, and that makes the CTL unenforceable.[6]

In sum, Gander Mountain and Cabela's agreed on some things in negotiating the CTL: They agreed that, for $1,000, Cabela's would receive a perpetual, exclusive license to use certain trademarks.  But they did not agree on other things, including the form and content of the license agreement.  The parties did provide that Cabela's perpetual, exclusive trademark license would be in form and content "customary" to perpetual, exclusive trademark licenses generally.  But that phrase is objectively indefinite, and Cabela's has submitted no evidence that Gander Mountain and Cabela's reached a subjective agreement as to its meaning.  It is clear that Gander Mountain and Cabela's did not reach agreement on material terms — that, at most, they agreed to agree.  For that reason, the CTL is unenforceable, and Gander Mountain's motion for summary judgment is granted.

V.

As described above, Cabela's failed to develop any evidence that the CTL's reference to "customary to licenses of the type described above" — when understood to refer to perpetual, exclusive trademark licenses generally — had a sufficiently definite objective meaning to be enforced or that the parties reached a subjective agreement on the meaning of the otherwise indefinite phrase.  Instead of developing such evidence, Cabela's assumed that it would prevail in arguing that "customary to licenses of the type described above" referred only to the 1996 License, and Cabela's conducted discovery accordingly.  At oral argument, when it became clear

---

[6]The fact that Gander Mountain and Cabela's failed to agree on material terms distinguishes this case from *Lambert*, in which the court held that any terms omitted by the parties were simply not material.  *See Lambert*, 575 F.2d at 137.

that Cabela's position would not prevail, Cabela's essentially blamed the Court for its litigation strategy, and asked that it be allowed to reopen discovery in this three-year-old case.

Cabela's relies on the fact that, during discovery, Gander Mountain sought evidence from Cabela's of Cabela's understanding of the customary form and content of perpetual, exclusive trademark licenses generally.  Cabela's resisted such discovery requests, the magistrate judge sided with Cabela's, and this Court did not find that the magistrate judge's discovery order was "clearly erroneous or contrary to law" under Rule 72(a).  *See* Docket Nos. 94, 117.[7]  Cabela's argues that, based on the Court's decision to affirm the magistrate judge's order, Cabela's reasonably assumed that this Court agreed with Cabela's that the phrase "customary to licenses of the type described above" referred only to the 1996 License and not to perpetual, exclusive trademark licenses generally.

Cabela's assumption was not reasonable.  As Cabela's knows, an order issued by a magistrate judge on a discovery dispute is reviewed under an extremely deferential standard. Such an order will be overturned only if the district judge "'on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Chase v. Comm'r*, 926 F.2d 737, 740 (8th Cir. 1991) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Cabela's could not have assumed that this Court was deciding the central issue in this litigation in the context of a review of a discovery order, based on the abbreviated filings of the parties,

---

[7]The Court considers the magistrate judge's July 18, 2006 discovery order — and this Court's October 20, 2006 order affirming that order — as the only relevant orders for purposes of this discussion.  The July 18 order was the only discovery order that was reviewed and affirmed by this Court.  Whether or not the magistrate judge has in some other order implied agreement with Cabela's interpretation of the CTL is irrelevant, as no litigant can reasonably assume that a district judge will always agree with the views of a magistrate judge.

-15-

and in an order that said nothing except "[t]he Court has reviewed Gander Mountain's objections and finds nothing in [the magistrate judge's] order to be clearly erroneous or contrary to law." Docket No. 117.

The context of the Court's order must also be borne in mind.  At the time that the Court reviewed the magistrate judge's discovery order, Cabela's had already staked out its position that "customary to licenses of the type described above" referred to the 1996 License and to nothing else.  If the Court ultimately agreed with Cabela's, then the discovery sought by Gander Mountain would be irrelevant.  If the Court ultimately disagreed with Cabela's, then Cabela's would lose, and the discovery sought by Gander Mountain would likewise be irrelevant.  It is not the job of this Court or the magistrate judge to prevent a party from staking its success in an action entirely on one argument.  In this context — where only Cabela's could have been prejudiced by the magistrate judge's acceptance of Cabela's arguments about the scope of discovery — the Court found the magistrate judge's order was  not "clearly erroneous or contrary to law."

The bottom line is that nothing in any order of this Court can fairly be characterized as a definitive ruling on the merits of the dispute between Gander Mountain and Cabela's as to the meaning of the CTL, and nothing can fairly be said to have induced Cabela's to rely on one argument and abandon discovery on all others.  If Cabela's chose to view the outcome of a discovery dispute as a vindication of its interpretation of the CTL — despite the fact that Gander Mountain continued to vigorously dispute that interpretation, and despite the fact that the parties' positions had never been presented to the Court in the context of a dispositive motion — then Cabela's acted at its own risk.  It was entirely Cabela's choice not to obtain discovery or present

evidence that was relevant under Gander Mountain's theory of the case, and instead to permit

only that discovery and present only that evidence that was relevant under Cabela's theory of the

case.  Cabela's must live with the consequences of its litigation strategy.  Discovery will not be

reopened.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS

HEREBY ORDERED THAT:

1.      Plaintiff's motion for summary judgment [Docket No. 156] is GRANTED.

2.      Defendant's motion for summary judgment [Docket No. 164] is DENIED.

3.      Defendant's counterclaims [Docket No. 34] are DISMISSED WITH PREJUDICE

        AND ON THE MERITS.

4.      Plaintiff's objections to various discovery rulings [Docket Nos. 169, 204] are

        DENIED as moot.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: July 10, 2007                          s/Patrick J. Schiltz                        
                                             Patrick J. Schiltz
                                             United States District Judge